**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

JOAN M. REEDY,                          :
                                        :
                    Plaintiff           :      CIVIL ACTION NO. 3:11-CV-02056
                                        :
        vs.                             :          (Complaint Filed 11/3/11)
                                        :
MICHAEL ASTRUE,                         :
COMMISSIONER OF SOCIAL                  :              (Judge Caputo)
SECURITY,                               :
                                        :
                    Defendant           :

## <u>MEMORANDUM</u>

## <u>BACKGROUND</u>

        The above-captioned action is one seeking review of a decision of the

Commissioner of Social Security ("Commissioner") denying Plaintiff Joan M. Reedy's claim

for social security disability insurance benefits.

        On April 1, 2009, Reedy filed protectively[1] an application for disability

insurance benefits. Tr. 53, 149, 177-180 and 187.[2]  The application was initially denied by

the Bureau of Disability Determination[3] on July 15, 2009. Tr. 53 and 150-153.  On August

24, 2009, Reedy requested a hearing before an administrative law judge. Tr. 53 and 154-

---

[1]Protective filing is a term for the first time an individual contacts the Social Security
Administration to file a claim for benefits.  A protective filing date allows an individual to
have an earlier application date than the date the application is actually signed.

[2]References to "Tr._" are to pages of the administrative record filed by the
Defendant as part of his Answer on January 13, 2012.

[3]The Bureau of Disability Determination is a state agency which initially evaluates
applications for disability insurance benefits on behalf of the Social Security Administration.
Tr. 150.

156.  After about 15 months had passed, a hearing was held on November 15, 2010. Tr. 68-110.   On December 15, 2010, the administrative law judge issued a decision denying Reedy's application. Tr. 53-62.  On February 14, 2011, Reedy filed a request for review with the Appeals Council and on September 13, 2011, the Appeals Council concluded that there was no basis upon which to grant Reedy's request. Tr. 1-6 and 39-40.   Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Reedy then filed a complaint in this court on November 3, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on April 9, 2012,  when Reedy filed a reply brief.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes.  The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured."  It is undisputed that Reedy met the insured status requirements of the Social Security Act through September 30, 2010. Tr. 53, 55, 181 and 187.   In order to establish entitlement to disability insurance benefits Reedy was required to establish that she suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A), (c)(1)(B); 20 C.F.R. §404.131(a)(2008); see Matullo v. Bowen, 926 F.2d 240, 244 (3d Cir. 1990).

Reedy, who was born in the United States on May 23, 1963, withdrew from high school in 1979 after completing the 11th grade and can read, write, speak and

_____

[4]Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal."  M.D.Pa. Local Rule 83.40.1.

understand the English language and perform basic mathematical functions. Tr. 75, 149, 191, 196, 209 and 250. After withdrawing from high school, Reedy did not obtain a General Equivalency Diploma. Tr. 102. During Reedy's elementary and secondary schooling, she attended regular education classes. Tr. 196. Reedy stated that she did not complete any type of special job training, trade or vocation school. Id.

Reedy has past relevant employment[5] as a phlebotomist which was described as semi-skilled, light work by a vocational expert.[6] Tr. 102-103. The record reveals that

---

[5]Past relevant employment in the present case means work performed by Reedy during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner. 20 C.F.R. §§ 404.1560 and 404.1565.

[6]The terms sedentary, light, medium and heavy work are defined in the Social Security regulations as follows:

(a) *Sedentary work*. Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

(b) *Light work*. Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

(c) *Medium work*. Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can do sedentary and light work.

(continued...)

3

Reedy worked as a phlebotomist for Geisinger Medical Center in Danville, Pennsylvania, for at least two years.[7] Tr. 102-103, 184-185 and 193. In a document filed with the Social Security Administration Reedy without specifying the dates stated that she worked for (1) Home Depot in the lawn and garden department, (2) a coffee shop where she served coffee, (3) a company that sealed driveways where she cleaned the driveways, and (4) as a phlebotomist for Geisinger Medical Center. Tr. 217-221. With respect to the company that sealed driveways, Reedy stated this was her husband's business and that she would use a "backpack blower" and at times "lift some equipment" weighing 50 pounds Tr. 221. In another document Reedy also reported without specifying the dates that she worked for Panera Bread in Bloomsburg, Pennsylvania, and for a CVS pharmacy in Danville as a

---

[6] (...continued)

> (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567.

[7] Although it appears that you do not have to be certified to practice phlebotomy (the drawing of blood) in Pennsylvania, Reedy had to have completed some training to do so. The vocational expert testified that the job was considered semi-skilled work which is considered having a Special Vocational Preparation (SVP) rating of 3 or 4. An SVP 3 position requires over 1 month up to and including 3 months of training before an individual can engage in average performance of the job. An SVP 4 position requires over 3 months up to and including 6 months. See Social Security Program Operation Manual System (POMS), DI 25001.001 Medical-Vocational Quick Reference Guide, https://secure.ssa.gov/poms.nsf/lnx/0425001001 (Last accessed March 21, 2013); POMS, DI 25015.015, Work Experience as a Vocational Factor, https://secure.ssa.gov/poms.nsf/lnx/0425015015 (Last accessed March 21, 2013).

pharmacy technician.[8] Tr. 251.

Records of the Social Security Administration reveal that Reedy had reported earnings in the years 1978 through 1981, 1983, 1984, 1986, 1989 and 1999 through 2007. Tr. 182. Reedy's highest annual reported earnings were in 2006 ($15,300.00) and her lowest in 1978 ($77.52). Id. Reedy's total reported earnings during those years were $49,933.11. Id. The earnings records reveal that Reedy worked for Geisinger Medical Center in 2000 (earning $2469.75), 2002 (earning $3330.68) and 2003 (earning $4942.34). Tr. 184-185. Reedy worked for Home Depot in 2003 (earning $1534.50), 2004 (earning $9527.15) and 2006 (earning $15,300.00) and for Panera Bread in 2005 (earning $391.05). Tr. 185. The earnings records also reveal that Reedy worked for the following entities: (1) Rea & Derick, Inc., in 1999 earning $2515.69, (2) ICT Group, Inc., in 2000 and 2003, earning $1190.67 and $5.00, respectively, (3) Johnny Foods, Inc., in 2000 earning $337.13, (3) Trinity United Methodist Church in 2001 and 2002, earning $1579.51 and $1719.27, respectively, (4) Muffin Man, Inc., in 2001 earning $259.50, and (5) Home Team Lending, LLC, in 2007 earning $1160.00. Tr 184-185. Reedy also worked in 2009 for Bath & Body Works, LLC, apparently for one day (the day after Thanksgiving)) and earned $72.00. Tr. 183 and 243.

Reedy alleged that she became disabled on June 15, 2006, because of failed back surgery, rheumatoid arthritis, fatigue and concentration problems, degenerative disc disease, radiculopathy and severe musculoskeletal pain, including joint pain. Tr. 75-76, 99, 192 and 215-216. In documents filed with the Social Security Administration Reedy

---

[8]It seems odd that an individual without a high school education or a General Equivalency Diploma would be working as a pharmacy technician.

stated that she has constant severe pain as the result of a long history of back problems. Tr. 192. She also contends that she cannot bend, stretch or reach and has an inability to use her hands because of arthritis. Tr. 76. Ready alleged that she stopped working on June 15, 2006, the disability onset date because she was in "too much pain to continue working." Tr. 192.

For the reasons set forth below we will remand the case to the Commissioner for further proceedings.

## STANDARD OF REVIEW

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988)(quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008);  Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707.  Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

Another critical requirement is that the Commissioner adequately develop the record. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000)("The ALJ has an obligation to

develop the record in light of the non-adversarial nature of benefits proceedings, regardless of whether the claimant is represented by counsel."); Rutherford v. Barnhart, 399 F.3d 546, 557 (3d Cir. 2005); Fraction v. Bowen, 787 F.2d 451, 454 (8th Cir. 1986); Reed v. Massanari, 270 F.3d 838, 841 (9th Cir. 2001); Smith v. Apfel, 231 F.3d 433. 437 (7th Cir. 2000); see also Sims v. Apfel, 530 U.S. 103, 120 S.Ct. 2080, 2085 (2000)("It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). If the record is not adequately developed, remand for further proceedings is appropriate. Id.

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance

8

and supplemental security income claims. <u>See</u> 20 C.F.R. §404.1520; <u>Poulos</u>, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[9] (2) has an impairment that is severe or a combination of impairments that is severe,[10] (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment,[11] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. <u>Id</u>. As part of step four the administrative law judge must determine the claimant's residual functional capacity. <u>Id</u>.[12]

Residual functional capacity is the individual's maximum remaining ability to

---

[9]If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further.

[10] The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. <u>Id.</u> If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process. 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

[11]If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

[12]If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.

do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id; 20 C.F.R. § 404.1545; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

**MEDICAL RECORDS**

Before we address the administrative law judge's decision and the errors committed by him, we will review some of Reedy's medical records. Although Ready's alleged disability onset date is June 15, 2006, the impetus for her alleged present disability is rheumatoid arthritis, a progressive condition, and back surgeries performed in 1994 and 1995. Consequently, we will began with a review of medical records that predate the disability onset.

In 1994, Reedy was diagnosed with a herniated nucleus pulposus at the L5-S1 level of the lumbar spine on the left side.[13] Tr. 455. An MRI ordered by Keith Gibson, M.D., Reedy's primary care physician, revealed "a very large chunk of disk material sitting directly beneath her nerve root in an extra-annular location." Tr. 457. Dr. Gibson prescribed narcotic

---

[13]The intervertebral discs, the soft cushions between the 24 bony vertebral bodies, have a tough outer layer and an inner core composed of a gelatin-like substance, the nucleus pulposus. The outer layer of an intervertebral disc is called the annulus fibrosus. A bulge (protrusion) is where the annulus of the disc extends beyond the perimeter of the vertebral bodies. A herniation is where the nucleus pulposus goes beyond its normal boundary into the annulus and presses the annulus outward or ruptures the annulus. Such bulges(protrusions) and herniations if they contact nerve tissue can cause pain.

pain medications and referred her to the Department of Neurosurgery at Geisinger Medical Center. Tr. 455. Reedy was admitted to the Geisinger Medical Center on August 18, 1994, for surgery. Tr. 455. A physical examination on the date of admission revealed "an acutely uncomfortable woman who was crying and writhing on the table with left leg pain." Tr. 455. She also exhibited an abnormal gait; she had decreased strength and sensation in her left leg and she dragged her left leg. Id. The surgery - excision of the herniated nucleus pulposus – was performed on August 19, 1994. Tr. 457. The operative report reveals that the herniated disc "was removed in its entirety " and "[a] small amount of much better looking disk material was removed from the disk space immediately beneath through the rent in the annulus[.]" Id. The wound was then closed and the "[p]ostoperative conduction was satisfactory." Id.

In October, 1994, Reedy's left leg pain returned and that pain was "treated conservatively without relief." Tr. 459. An MRI performed in June, 1995, revealed "a recurrent herniated disk L5-S1 on the left[.]" Id. Reedy complained of severe pain radiating down the left leg with numbness in the left foot. Id. On July 17, 1995, Reedy was admitted to the Geisinger Medical Center for "[e]xcision of [the] recurrent disk." Id. Surgery was perform on July 17th to remove the recurrent disk and Reedy was discharged from the hospital on July 20th. Tr. 460-461. The discharge summary states in relevant part as follows: "She had some mild complaints the day following surgery, which was attributed to some of the medications. With adjustment of the drug regimen, she became ambulatory and was less light-headed and would walk with a normal gait. At the time of discharge, her incision was clean and dry. She was stable and was given routine instructions." Tr. 460.

On June 25, 1996, Reedy had an appointment with Kaylan S. Krishnan, M.D.,

at the Geisinger Medical Center. Tr. 481-482.  At that appointment Reedy complained of "[c]hronic low back pain" which commenced after a "motor vehicle accident in December 1995" and the two surgeries performed in August, 1994, and July 1995. Tr. 481.  A physical examination performed by Dr. Krishnan revealed "tenderness to palpation over the lumbosacral spine area with maximal tenderness at L5-S1" and a straight leg raising test was positive on the left at 60 degrees.[14] Id.  Dr. Krishnan administered an epidural steroid injection at the L5-S1 level of the lumbar spine. Tr. 482.

On August 21, 1998, Reedy's ongoing low back pain and left leg pain was evaluated at Geisinger Medical Center by W. Fred Hess, M.D.  Tr. 483-485.  Dr. Hess noted that the surgeries performed in 1994 and 1995 gave Reedy temporary relief and that the motor vehicle accident in December, 1995, "exacerbated her back pain." Tr. 483.  Dr. Hess reported that an MRI of the lumbar spine performed on October 3, 1996, and an x-ray performed on August 21, 1998,  revealed

> severe degeneration at the L5-S1 level.  There is a very early degeneration signal at the L4-5 level.  The disk height is well maintained throughout the lumbar spine with the exception of L5-S1 which is markedly narrowed. There is a traction spur at the L5-S1.  There are postsurgical changes and scarring on the left side at L5-S1.  There does appear to be what appears to be a disk fragment, but this is somewhat difficult to differentiate between scarring.  There are "modic" changes of the end plates. X rays today include a standing lateral spine.  This demonstrates narrowing of the L5-S1 disk space and traction spur.  Three-view lumbar spine films show a vacuum disk phenomenon.  The disk space at L5-S1 is almost completely collapsed. The disk height in the remainder of the lumbar

---

[14]The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his or her leg lifted.  The test is positive if pain is produced between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing for Herniated Discs: Straight Leg Raise, SpineUniverse, http://www.spineuniverse.com/experts/testing-herniated -discs-straight-leg-raise (Last accessed March 26, 2013).

spine is well maintained.

Tr. 484.  Dr. Hess's assessment was that Reedy suffered from "[l]umbar disk disease with degenerative disease, L5-S1, and left S1 radiculopathy with question of scarring versus recurrent [herniated nucleus pulposus]" and obesity. Id.

The record reveals that from sometime in 1995 to the year 2000 Reedy was receiving Social Security Disability benefits. Tr. 59 and 89.  Reedy testified that she voluntarily terminated her benefits because an employee of the district Social Security Office accused her of working.[15] Tr. 59.

On February 6, 2001, Reedy had an appointment with Eric Newman, M.D., of the Department of Rheumatology at Geisinger Medical Center, Danville. Tr. 493-494.  After reviewing blood test results and performing a physical examination, Dr. Newman concluded that Reedy had "some minor symptoms and some serologic studies which raise the possibility of an early connective tissue disease or rheumatoid arthritis." Tr. 494.  A copy of Dr. Newman's report was sent to Dr. Gibson. Id.

On March 6, 2002, Reedy had an appointment at Geisinger Medical Center with Dr. Gibson who in his report of this appointment stated that Reedy was being "followed in rheumatology for [rheumatoid arthritis]." Tr. 463.  When Dr. Gibson performed a physical examination of Reedy's extremities he observed the following: "No cyanosis, clubbing, or

---

[15]The record reveals that Reedy had no reported earnings from 1990 through 1998, $2515.69 in 1999 and $4632.05 in 2000.  Pursuant to Federal Regulations a person's earnings have to rise to a certain level to be considered substantial gainful activity.  The official website of the Social Security Administration reveals that in 1999 the amount was $700 per month (or $8400 per year) and in 2000 the amount was 740 per month (or $8880.00).  Substantial Gainful Activity, http://www.ssa.gov/oact/cola/sga.html (Last accessed March 25, 2013).   The only year in which Reedy met the substantial gainful activity level was 2006, when she earned $15,300.00

13

edema, Normal [range of motion], muscle strength, and tone. No evidence of joint deformity, inflammation, or effusion. Pedal pulses intact and symmetrical." Tr. 465   Dr. Gibson made similar findings at a physical examination of Reedy on August 6, 2002. Tr. 512-514.   Dr. Gibson's assessment at that examination was that Reedy suffered from obesity and he referred her to specialist in bariatric surgery.[16] Tr. 514.   Reedy was counseled and treated by the Comprehensive Weight Management Clinic at Geisinger Medical Center in November and December, 2002, and January and February, 2003. Tr. 518-532, 546-551 and 570-579.

At an appointment on January 23, 2003, Dr. Gibson after examining Reedy reported that Reedy was "[h]aving numerous complications related to her weight – GERD, arthritis, fatty liver, chronic back pain, depression, glucose intolerance, etc." and that she needed to consider bariatric surgery. Tr. 541-542.   On March 12, 2003, a psychologist at Geisinger Medical Center after examining Reedy reported that there were "no psychological contraindications" preventing Reedy from having bariatric surgery. Tr. 563.   On March 20, 2003, a nutritionist at Geisinger Medical Center reported that Reedy "fits the criteria for bariatric surgery and should continue the pre-screening process." Tr. 581.

On May 14, 2003, Reedy had a routine checkup with Dr. Gibson.  Tr. 601. At that appointment Reedy was "fed up with everything" and "[s]till waiting to see if her bariatric surgery [would] be approved." Tr. 601. Dr. Gibson noted that Reedy was "[w]orking at

---

[16]Reedy weighed 237 pounds and was 5 feet, 2 inches tall.  An individual of such height and weight has a body mass index of 43.3 and is considered morbidly obese. Center for Disease Control and Prevention. Healthy Weight, Adult BMI Calculator, http://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_ bmi_calculator/bmi_calculator.html (Last accessed March 25, 2013). A person with a BMI of 30 and higher is considered obese and a BMI of 40 and higher morbidly or extremely obese. Obesity, Symptoms, Mayo Clinic Staff, MayoClinic.com, http://www.mayoclinic. com/health/obesity/DS00314/DSECTION=symptoms(Last accessed March 25, 2013).

phlebotomy in main hospital" and that "[b]y the end of the day, her back, feet, and legs are 'killing' her secondary to pain." Id. Dr. Gibson's assessment was that Reedy suffered from chronic low back pain and obesity. Tr. 603. Reedy had appointments at the Comprehensive Weight Management Clinic on May 14 and June 2, 2003; she had an appointment with a surgeon on June 25, 2003; and then Reedy on June 26, 2003, was admitted to the Geisinger Medical Center and bariatric surgery performed. Tr. 594-600, 608-609 and 614-627.

At the time of the surgery Reedy weighed 235 pounds. Tr. 641. Reedy was discharged from the hospital on June 29, 2003, in a stable condition. Tr. 552-556 and 610. A report from Christopher D. Still, D.O., an examining physician on the date of discharge reveals that Reedy had lost 18 pounds since the surgery and was doing quite well. Tr. 641. She went from 235 to 217 pounds. Id. Also Dr. Still stated that as far as he was concerned she could go back to work.[17] Id.

On July 10, 2003, Reedy had a follow-up appointment at the Comprehensive Weight Management Clinic. Tr. 632. The report of that appointment reveals that since the surgery Reedy lost 13 pounds (she gained 5 pounds since the date of discharge from the hospital). Id. It was further noted that Reedy had "much more energy" and that she was "[a]ble to do much more physical activity." Id. At an appointment on September 22, 2003, with the Comprehensive Weight Management Clinic, Reedy weighed 208 pounds. Tr. 646. Again it was noted that Reedy had "much more energy" and could "do much more physical activity." Id.

_____

[17]Reedy was working as a phlebotomist at Geisinger Medical Center on less than a full-time basis.

On January 26, 2004, Reedy had an MRI of the lumbar spine performed at the Geisinger Medical Center. Tr. 731-732. The MRI revealed nothing of significance from the T11 level of the thoracic spine through the L4 level of the lumbar spine. Id. However, at the L4-L5 level there was (1) a central disc protrusion which did not appear to distort the thecal sac,[18] (2) bilateral mild to moderate neural foraminal narrowing, and (3) disc desiccation. Tr. 731. At the L5-S1 level there were (1) endplate changes consistent with degenerative disc disease, (2) disc desiccation and lose of disc space height, (3) a broad-based disc bulge causing mild bilateral neural foraminal narrowing, and (4) a subtle retrolisthesis of L5 on S1.[19] Id.

On March 17, 2004, Reedy had a yearly examination performed by Dr. Gibson at Geisinger Medical Center. Tr. 656-662. At that appointment, Reedy denied any changes in her health over the past year. Tr. 656. It was reported that Reedy lost 40 pounds from the bariatric bypass surgery and Ready stated that she "fe[lt] good." Id. Ready did complain about "a lot of back pain and generalized aches and pains." Id. She reported that she was taking 8-10 Percocet daily for pain relief. Id. The physical examination with respect to Reedy's extremities revealed "[n]o cyanosis, clubbing, or edema. Normal [range of motion], muscle strength, and tone. No evidence of joint deformity, inflammation, or effusion. Pedal pulses intact and symmetrical." Tr. 658. Dr. Gibson's assessment was that Reedy suffered from chronic low back pain, failed back surgery syndrome, and obesity. Id. Reedy weighed

[18]The thecal sac is an elongated tube that extends from the brain to the end of the spine in which the spinal cord and nerve roots run. It is a covering (membrane) that surrounds the spinal cord and contains cerebral spinal fluid. Herniated discs which impinge the thecal sac may or may not cause pain symptoms.

[19]Retrolisthesis is a backward slippage of one vertebral body on another.

201 pounds giving her a BMI of 36.8 placing her in the category of obese. Id. Dr. Gibson noted that Reedy had been through the pain and orthopedic clinics and was currently on the narcotic Percocet for pain. Id. Dr. Gibson discussed with Reedy the use of methadone for pain control. Id. An appointment record dated June 4, 2004, reveals that the Percocet caused abdominal problems (constipation) and Dr. Gibson attempted to wean Reedy off that drug by using methadone. Tr. 664-665.

On September 16, 2004, Reedy had an appointment with Dr. Gibson at which Reedy complained of problems with her right wrist for over a year. Tr. 672. Reedy stated the condition was getting worse. Id. She complained of decreased range of motion and that her joints were warm to touch. Id. Dr. Gibson's examination of the right wrist revealed that it was "swollen diffusely" and had "increased warmth." Tr. 673. Reedy also had limited flexion and extension. Id. Dr. Gibson's assessment was that Reedy suffered from right wrist monoarthritis. Id.

At the request of Dr. Gibson, on October 13, 2004, Reedy was examined by Thomas M. Harrington, M.D., a rheumatologist at Geisinger Medical Center. Tr. 677-683. Dr. Harrington primarily evaluated Reedy's right wrist. Id. Reedy reported stiffness in her fingers lasting more than an hour; she denied myalgias(muscle pain); she reported numbness and tingling in both hands; she reported being tired all the time; and she reported bilateral lower extremity tingling and numbness. Tr. 677-678. Reedy told Dr. Harrington that she was working and the her job involved "significant physical exertion in the repair of sidewalks and driveways."[20] Tr. 678. Dr. Harrington's physical examination of Reedy

---

[20]The record does not give any indication as to how may hours per day/week Reedy
(continued...)

revealed no extremity clubbing, cyanosis or edema; no muscles tenderness or weakness; no findings to suggest synovitis[21] or arthritis in bilateral shoulders, elbows, hips, knees, ankles and toes; slight swelling with mild tenderness but no redness or warmth on the medial aspect and dorsolateral aspect of the right wrist; a hint of similar findings on the left wrist; no findings to suggest synovitis or arthritis of the joints of both hands; no palpable nodules of the hands; mild midline lower lumbar tenderness but no paraspinal or thoracic spinal tenderness. Id.  Dr. Harrington reviewed reports of blood work, including an elevated erythrocyte sedimentation rate (ESR or sed rate)[22] and Rheumatoid factor. Id.  Dr. Harrington gave a differential diagnosis[23] of rheumatoid arthritis involving one joint; chronic crystalline

---

[20](...continued)
was working.  Furthermore, the Social Security earnings records do not reveal that Reedy was working for her husband in 2004.

[21]Synovitis is defined as "inflammation of a synovium; it is usually painful, particularly on motion, and is characterized by a fluctuating swelling due to effusion within a synovial sac." Dorland's Illustrated Medical Dictionary, 1856 (32nd Ed. 2012).

[22]According to the Mayo Clinic's website the

> [s]ed rate, or erythrocyte sedimentation rate (ESR), is a blood test that can reveal inflammatory activity in your body.  A sed rate test isn't a stand-alone diagnostic tool, but the result of a sed rate test may help your doctor diagnose or monitor an inflammatory disease.

Sed rate (erythrocyte sedimentation rate), Definition, Mayo Clinic staff, http://www.mayoclinic.com/health/sed-rate/MY00343  (Last accessed March 27, 2013).

[23]"Differential diagnosis" is "[t]he process of weighing the probability of one disease versus that of other diseases possibly accounting for a patient's illness." http://www.medterms.com/script/main/art.asp?articlekey=2991 (Last accessed March 25, 2013).

18

arthritis from gout or CPPD [calcium pyrophosphate dihydrate disease]; arthritis secondary to Lyme disease; arthritis secondary to injury; and other rare possibilities including tuberculosis, fungal or tumor. Tr. 679.   Dr. Harrington noted that Reedy's care was complicated by the fact that she did not have insurance and was status post gastric bypass surgery which prevented her from taking nonsteroidal anti-inflammatory drugs. Id.

After June 15, 2006, the alleged disability onset date, the first medical record of relevance which we encounter is a record of an appointment Reedy had with Dr. Gibson at Geisinger Medical Center on July 31, 2007. Tr. 296-304.  Dr. Gibson stated that he had not seen Reedy "for awhile" because she had no insurance and that Reedy continued taking "methadone and percocet for her chronic low back pain." Tr. 296t.  Dr. Gibson noted that Reedy "gets by with these meds" and that Reedy reported "classic Pica[24] symptoms for the past weeks to months." Id.   Reedy was craving ice and was "eat[ing] ice all the time." Id. Reedy also complained of a continuing problem with her right wrist. Id.   The results of a physical examination reported by Dr. Gibson were normal. Tr. 298.   Dr. Gibson's assessment of the conditions suffered by Reedy included chronic low back pain which was "'stable' on methadone and percocet" and fatigue which he felt was most likely the result of anemia and he ordered a complete blood count. Id.  He also was of the opinion that Reedy suffered from rheumatoid arthritis but noted that the assessment and treatment of that condition was complicated because of Reedy's lack of insurance. Id.   The results of a

_____

[24]"Pica is a pattern of eating non-food material such as dirt or paper . . . Pica is seen more in young children than adults . . . In some cases, a lack of certain nutrients, such as iron dificiency anemia and zinc deficiency, may trigger the unusual cravings. Pica may also occur in adults who crave a certain texture in their mouth."  Pica, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/001538.htm (Last accessed March 25, 2013).

complete blood count revealed that Reedy suffered from iron deficiency anemia. Tr. Tr. 301 and 352-353.

On February 9, 2008, Reedy had an appointment with Anthony Billas, M.D., regarding 2-3 days of left flank pain radiating around the left side. Tr. 305. Dr. Billas's assessment after performing a physical examination was as follows: "New type of back pain in [patient] with chronic pain. [History] suspicious for [kidney infection] or [kidney] stones, but [urinalysis] and exam are normal." Id.

On July 31, 2008, Reedy had an appointment with Dr. Gibson at which Reedy complained of joint problems, including her right wrist was swollen and painful. Tr. 311. Reedy was again craving ice. Id. Dr. Gibson noted in his report of this appointment that Reedy "[w][orks with her husband sealing driveways."[25] Tr. 311. Reedy's current pain medications were listed as Percocet and Methadone. Tr. 312. The results of a physical examination were normal other than an elevated blood pressure. Tr. 312-313. Reedy had normal extremities with no evidence of cyanosis, clubbing or edema; normal range of motion, muscle strength and muscle tone; and no evidence of joint deformity, inflammation or effusion. Id. Dr. Gibbon's assessment was that Reedy had "probable Rheumatoid Arthritis" and iron deficiency anemia. Tr. 313.

On December 10, 2008, Reedy had an appointment with Kerrie L. Hoffman, M.D., a rheumatologist at Geisinger Medical Center for an evaluation of her arthritis. Tr. 318-328. Ready complained of pain in her right arm and hand and difficulty making a fist. Tr. 318. Reedy reported some difficulty with the left hand but not as bad as the right. Id. She

---

[25]There was not indication of what type of work she performed or how many hours per day/week she worked.

also complained of back pain, bilateral shoulder pain, and hip pain. Id. A physical examination revealed tenderness in the cervical area with palpation; right hand/wrist inflammation and tenderness to palpation with decreased grip/grasp strength; left hand tenderness to palpation with decreased grip/grasp strength but greater than the right; and joint and muscle tenderness throughout the body. Tr. 319. The assessment was as follows: "Positive [rheumatoid factor] and clinical picture suspicious for Rheumatoid Arthritis]." Id. X-rays of the hands revealed nothing of significance with respect to the left hand but with respect to the right hand the x-ray revealed "[i]nflammatory/degenerative changes[.]" Tr. 326.

On April 30, 2009, Reedy had an appointment with Dr. Gibson complaining about "[e]verything!!" and left upper extremity radicular symptoms which were worse when turning the head to the left. Tr. 329. Reedy also complained of left lower extremity radicular symptoms. Id. Dr. Gibson engaged in hyperbole when he noted in the report of this appointment that Reedy "has not really been seen for years." Id. A physical examination revealed a "swollen right wrist," "a lump on her left fourth distal finger" and "some other deformities." Tr. 331. Dr. Gibson did not specify the "other deformities." Id. Dr. Gibson's assessment was that Reedy suffered from polyarthritis (probable Rheumatoid Arthritis), left upper and lower extremity radicular symptoms, finger lump and status post bariatric surgery. Id.

On May 12, 2009, Reedy had an appointment with Dr. Gibson at which Reedy complained of numbness and tingling down her left upper extremity when she turned her head to the left and weakness in her right arm. Tr. 343. A physical examination revealed swelling of the right and left wrist, right greater than the left; decreased hand grip on the right; decreased triceps reflex on the left and decreased biceps strength on the right. Tr. 345. Dr.

Gibson's assessment was that Reedy suffered from cervicalgia and bilateral radicular symptoms and possible Rheumatoid Arthritis. Id.

On July 7, 2009, after reviewing Reedy's medical records on behalf of the Bureau of Disability Determination, Theodore C. Waldron, D.O., concluded that Reedy could engage in a limited range of sedentary work. Tr. 357-363.  Dr. Waldron's assessment was that Reedy suffered from arthritis, neck pain and back pain.  Id.   Dr. Waldron did not examine Reedy.[26]   Dr. Waldron opined that Reedy could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk at least 2 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull the amounts that she could lift and/or carry. Tr. 358.   Dr. Waldron also found that  Reedy could occasionally engage in all of the postural activities, other than climbing ladders, ropes and scaffolds which Reedy should never do.  Tr. 359.  Reedy had no manipulative, visual or communicative limitations. Tr. 359-360.  Dr. Waldron stated that Reedy should avoid concentrated exposure to extreme cold and heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation and hazards such as moving machinery. Tr. 360.

On November 13, 2009, Reedy had an appointment with Dr. Gibson for a routine checkup. Tr. 408-421.  At that appointment Reedy complained of problems sleeping because of neck, back and wrist discomfort. Tr. 408.  Reedy also complained of left upper extremity radicular symptoms and she needed to "prop her arm up to help relieve the numbness and pain."  Id.   Dr. Gibson observed that Reedy's right wrist was "markedly swollen." Id.   A physical examination revealed that Reedy had "[l]imited extension and

---

[26]Also, there is no indication that Dr. Waldron reviewed the MRI performed on October 3, 1996, or the x-ray performed on August 21, 1998.

turning" of the neck "to the left side" and "definite synovitis of the wrist." Tr. 410.   At an appointment with Dr. Gibson on February 24, 2010, Reedy complained of "right sided neck pain for the past year - off and on" and "diffuse aches." Tr. 422.  Dr. Gibson's assessment was that Reedy suffered from "Neck pain - ? Etiology" and "Diffuse polyarthralgias." Tr. 424. Dr. Gibson noted that he would attempt to move up a rheumatology referral. Id.

The rheumatology referral occurred on April 27, 2010. Tr. 437-448.   Reedy was examined by Androniki Bili, M.D., and Carlos A. Nieto, M.D., at the Geisinger Rheumatology clinic. Id.  A physical examination revealed that Reedy had synovitis in the right and left wrist and paraspinal muscle tenderness. Tr. 439.  Reedy also had "positive serologies [rheumatoid factor] and [Cyclic Citrullinated Peptide] antibodies." Tr. 440.  Both physicians agreed that Reedy had rheumatoid arthritis. Tr. 437 and 440.  Dr. Bili referred to it as "erosive [Rheumatoid Arthritis] with pain, swelling and limited [range of motion] right wrist as well as synovitis in left wrist, MCPs[27] and ankles." Tr. 437.   It was decided to start Reedy, after obtaining baseline blood tests,  on the drug Methotrexate "in an attempt to control the disease and retard progression." Id.  Reedy was also prescribed the drug Trazodone to help her sleep. Id.  On  May  3, 2010, Reedy was instructed on "home administration" of  injectable Methotrexate. Tr. 689.

On  May 4, 2010, Dr. Bili informed Reedy that based on the results of a complete blood count she had "mild chronic anemia." Tr. 445 and 449.  Dr. Bili further informed her that her "Sedimentation rate (test for inflammation) was mildly elevated." Tr. 449.

---

[27]These are the joints at the knuckles.

On May 18, 2010, Reedy had a yearly examination performed by Dr. Gibson. Tr. 696-707.  Dr. Gibson noted that Reedy was "[s]eeing rheumatology (finally) for her [rheumatoid arthritis]" and "[d]oing okay" on the Methotrexate. Tr. 696.  He further noted that she was "[h]aving low back pain as usual." Id.   Dr. Gibson did not report any abnormal physical examination findings. Tr. 698.  Dr. Gibson noted that Reedy's current medications were Oxycodone (two 5 mg tablets four times per day), Methadone (two 10 mg tablets in the morning and one tablet in the evening for chronic pain), Methotrexate (0.4 ml subcutaneous weekly), and Trazodone (1 to 3 50 mg tablets at night). Tr. 697-698.  Dr. Gibson's assessment included rheumatoid arthritis, cervicalgia, and lumbar back pain. Tr. 698-699.

At an appointment with Dr. Gibson on July 1, 2010, Reedy reported that she had extreme fatigue and that her rheumatoid arthritis was not under control. Tr. 708.  Reedy reported vomiting "some dark material over the past week throughout one morning" and was having abdominal discomfort.  Id.  Reedy also complained that "her legs fe[lt] heavy all the time" with the right leg worse than the left. Id.  Dr. Gibson's assessment was that the fatigue was "undoubtedly related to [Rheumatoid Arthritis] and now anemia."  Tr. 710. Blood work confirmed that Reedy had anemia. Tr. 445, 449 and  716.

On July 7, 2010, Reedy had an MRI of the lumbar spine performed at Geisinger Medical Center. Tr. 727-728.  The interpreting radiologist impression was as follows: "1. The findings at L5-S1 show disk bulging and bony ridging which was seen previously [1/26/2004] as well as some disk desiccation. There appears to be a focal disk protrusion on the right in the right paramedian location at this level which may be slightly impinging upon the S1 nerve root. Clinical correlation is advised. Again it should be noted, that the patient had previous surgery at this level, and no contrast was given; so, if any

further surgery is contemplated, one may want to consider doing some additional imaging with contrast.  2. Midline disk protrusion at L4-L5.  This may be slightly impinging on the thecal sac a little more, although I do not think it is significantly changes from the previous study.  There is some facet and ligamentous hypertrophy at this level which is causing some mild narrowing of the thecal sac, but no focal impingement is seen in the canal itself.  The neural foramina remain narrowed bilaterally but unchanged from the previous study related to the disk bulging." Tr. 728.  Dr. Gibson after reviewing the MRI report notified Reedy that it "shows probably some worsening of her [lumbar/sacral] spine disease - some increase in the bulging of one of her discs."[28] Id.

On July 28, 2010, Reedy was examined by Dr. Krishnan at the Geisinger Interventional Pain Center. Tr. 746.  Dr. Krishnan also reviewed the recent MRI. Id.  A physical examination of Reedy revealed bilateral lumbar paraspinal tenderness at the L5-S1 level and upper paraspinal tenderness to palpation; sacral tenderness to palpation; pain with lumbar range of motion prior to endpoint (flexion and extension); slightly decreased deep tendon reflexes of the patella and achilles; and decreased sensation to touch at the left shin/calf region. Tr. 751.  Dr. Krishnan's assessment was that Reedy suffered from (1) post-laminectomy syndrome lumbar spine; (2) lumbago; (3) lumbar spondylosis; (4) bilateral lower extremity radiculopathy [left greater than right] with left lower extremity residual paresthesia; and (5) [degenerative disc disease] lumbar spine L4-5 and L5-S1. Id.

On August 10, 2010, Dr. Gibson who had a treating relationship with Reedy

---

[28]Obviously, Dr. Waldron, the state agency physician, was not privy to this MRI in 2009 when he concluded that Reedy could engage in a limited range of full-time sedentary work.

since 1994 wrote a letter which states in relevant part as follows:

> I am writing this letter for Joan M. Reedy whom I follow in my Family
> Practice clinic at the Geisinger Medical Center in Danville, PA.
>
> Joan is a 47 y.o. female patient with several unfortunate diagnoses
> including rheumatoid arthritis, lumbar disc disease, and chronic
> low back pain related to disc problems.
>
> She sees Rheumatology for her arthritis (seropositive erosive RA) and
> is currently on Methotrexate for this. She has significant pain, swelling,
> and limited motion in her wrists, hands, and ankles and she is
> significantly impaired with this disease. She has a hard time using
> her hands and wrists for even basic daily activities.
>
> On top of this, she has chronic low back pain secondary to post-
> laminectomy syndrome/ DDD. She had L5-S1, disc surgery 8/94
> and 7/95, and she has been left with unrelenting pain. She is on
> chronic narcotics for this, and she sees Geisinger's Pain Therapy
> doctors for epidural steroid injections. Again, this pain syndrome
> (on top of her RA discomfort) leaves her with little relief from pain.
> Her trunk mobility is limited and she has trouble lifting, bending,
> squatting, etc.
>
> Joan has been on disability in the past, and I am asking for you
> to consider her again for disability.

Tr. 779.

On August 27, 2010, Reedy was examined by Dr. Bili at the Geisinger
Rheumatology Department. Tr. 825-828. Dr. Bili observed that Reedy had synovitis of the
joints of the fingers, toes and right wrist; tenderness in the joints of the fingers, toes, ankles
and right wrist; limited range of motion in the right wrist; 10 musculoskeletal tender points;
and tenderness to percussion of the lumbar/sacral and paraspinal muscles. Dr. Bili's
assessment was that Reedy suffered from rheumatoid arthritis, lumbosacral spondylosis,

lumbar spinal stenosis and lumbosacral neuritis[29]. Tr. 826-827.

> After the date last insured of September 30, 2010, Dr. Gibson submitted documents in which he opined that Reedy was incapable of engaging in work activity as a result of her rheumatoid arthritis and chronic back issues. Tr. 767-776.  In giving that opinion, Dr. Gibson referred, inter alia, to his history of treating Reedy since 1994,  the MRI of July, 2010 and  Dr. Bili's examination of August 27, 2010.[30]

---

[29]Neuritis is defined as "inflammation of a nerve, with pain and tenderness, anesthesia and paresthesia, paralysis, wasting, and disappearance of the reflexes." Dorland's Illustrated Medical Dictionary, 1263 (32nd Ed. 2012).

[30]After the ALJ denied Reedy's application for disability benefits, letters from Dr. Bili and Dr. Krishnan were submitted to the Appeals Council.  Tr. 8, 37-38 and 41.  Dr. Bili in a letter dated April 14, 2011, stated in part as follows:

> Because of the involvement of the hands and wrists, she is unable to perform handling and grasping, fingering and using her hands for feeling.  She has been experiencing daily pain, fatigue, and stiffness which prevent her from doing her daily activities and work.
>
> In addition she continues to have severe chronic low back pain due to lumbar spinal stenosis that prevents her from sitting, standing or walking for any length of time.
>
> Her picture is further complicated by severe fatigue that is partly due to active rheumatoid arthritis and partly due to iron deficiency anemia from menorrhagia.
>
> All in all, I believe that Joan is unable to perform any type of occupation because of joint pain, swelling, stiffness, chronic low back pain and fatigue.  Engaging in any repetitive activity would not only cause increased pain and suffering but would interfere with the effectiveness of attempted treatment.

Tr. 8.  In a letter dated February 3, 2011, Dr. Billi stated in part as follows: "We have difficulty controlling her disease without her being working and it would be more difficult to do so in the demands from a manual job." Tr. 41.  In a letter dated February 17, 2011, Dr. Krishnan stated in part: "Joan is in constant severe pain. She has a clearly abnormal MRI.

(continued...)

**DISCUSSION**

The administrative record in this case is 841 pages in length and we have thoroughly reviewed that record. Reedy argues that the administrative law judge erred (1) at step 3 of the sequential evaluation process when he concluded, inter alia, that Reedy did not have evidence of nerve root compression or lumbar spinal stenosis and (2) when he asked the vocational expert to offer an opinion based on a hypothetical question not supported by substantial evidence. Reedy also contends that the administrative law judge erred when considering the medical evidence and Reedy's credibility and engaging in his own lay analysis of the medical evidence as a basis to reject the opinions of treating physicians. In essence Reedy contends that the ALJ inappropriately considered her claim that she suffered from debilitating pain and that the ALJ's residual functional capacity assessment was based on the ALJ's erroneous consideration of the medical evidence, including the ALJ's analysis of the MRI reports. We need not address, Reedy's claim regarding the questioning of the vocational expert because Reedy's arguments regarding the ALJ's error at step 3 and the ALJ's erroneous assessment of Reedy's credibility and functional ability have merit.

The administrative law judge at step one of the sequential evaluation process

---

[30](...continued)
It is not correct that Joan does not have nerve compression. . . . The most recent MRI shows scar around the nerve root at L5-S1 . . . there is evidence that the patient can have bilateral leg pain due to these findings on the MRI." Tr. 37. We mention these letters to complete our review of the medical records but do not rely on them in rendering a decision. There were also letters dated January 3 and 9, 2012, from Dr. Bili and Dr. Krishnan, respectively, which were not before the ALJ or the Appeals Council but were attached to a motion to supplement the record filed in this court. We will not consider those letters but will only rely on the medical records that were before the ALJ when he rendered his decision.

found that Reedy had not engaged in substantial gainful work activity during the period from her alleged onset date of June 15, 2006, through her date last insured of September 30, 2010. Tr. 55.

Step two of the sequential evaluation process, is the first point at which the administrative law judge committed legal and factual error. At step two of the sequential evaluation process, the administrative law judge found that Reedy had the following severe impairments: "obesity with status post gastric bypass; lumbar degenerative disc disease; and rheumatoid arthritis in the right greater than left bilaterally." Id. The administrative record, however, reveals that Reedy was diagnosed with several other conditions and the administrative law judge did not make a determination as to whether or not those conditions were medically determinable impairments. The administrative law judge did not make a determination as to whether or not Reedy suffered from bilateral lower extremity radiculopathy,[31] lumbar spinal stenosis, chronic anemia, failed back surgery syndrome, and cervicalgia, all of which are mentioned in the medical records.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments and then when setting a claimant's residual functional capacity considering the symptoms of both medically

---

[31]Radiculopathy is a condition where one or more nerves or nerve roots are affected and do not work properly. The nerve roots are branches of the spinal cord. They carry signals to the rest of the body at each level along the spine. Radiculopathy is a result of disc herniation or an injury causing foraminal impingement of an exiting nerve (the narrowing of the channel through which a nerve root passes). See, generally, Radiculopathy, MedicineNet.com, http://www.medicinenet.com/radiculopathy/article.htm (Last accessed March26, 2013). A herniated disc is one cause of radiculopathy. Id. Radiculopathy is a step beyond degenerative disc disease and severe cases may requires surgical intervention. Id.

determinable severe and non-severe impairments. 20 C.F.R. § 404.1529. The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520©. If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id. If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g). A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two. However, all of the medically determinable impairments both severe and non-severe must be considered at step two and then at step four when setting the residual functional capacity. The social security regulations mandate such consideration and this court has repeatedly so indicated. See, e.g., Christenson v. Astrue, Civil No. 10-1192, slip op. at 12 (M.D. Pa. May 18, 2011)(Muir, J.); Little v. Astrue, Civil No. 10-1626, slip op. at 19-21 (M.D.Pa. September 14, 2011)(Kosik, J.); Crayton v. Astrue, Civil No. 10-1265, slip op. at 32-35 (M.D.Pa. September 27, 2011); 20 C.F.R. §§ 404.1523 and 404.1545(a)(2).

The record suggests that Reedy suffered from several conditions in addition to the those found as severe by the administrative law judge. The failure of the administrative law judge to find the above noted conditions as medically determinable impairments, or to give an adequate explanation for discounting them, makes his decisions at steps two and four of the sequential evaluation process defective.

The error at step two of the sequential evaluation process, draws into question the administrative law judge's residual functional capacity determination and assessment of the credibility of Reedy. The administrative law judge found that Reedy's medically

determinable impairments could reasonably cause Reedy's alleged symptoms but that Reedy's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible. Tr. 57-58. This determination by the administrative law judge was based on an incomplete and faulty analysis of all of Reedy's medically determinable impairments.

At step three of the sequential evaluation process the administrative law judge found that Reedy's impairments did not individually or in combination meet or equal Listing 1.04, Disorders of the Spine. Tr. 56. In so finding, the administrative law judge stated that Reedy did not have evidence of nerve root compression or lumbar spinal stenosis as required. However, this finding was based entirely on the administrative law judge's lay analysis of the MRI reports. No treating or examining physician so stated. Furthermore, the physician who reviewed Reedy's medical records on behalf of the Bureau of Disability Determination did not so indicate. The MRI report of July 10, 2010, indicates that the S1 nerve root was slightly impinged. Tr. 728. We cannot conclude without a medical opinion in the record that the referenced impingement does not amount to nerve root compression. Furthermore, the MRI notes that there was foraminal narrowing. Id. The nerve roots exit through the neural foramina. This narrowing could suggest nerve root compression. Moreover, with respect to lumbar spinal stenosis, Dr. Bili on August 27, 2010, reported that Reedy suffered from that conditions. Tr. 827.

At step four, the administrative law judge found that Reedy could not perform her past relevant work as phlebotomist but that she had the residual functional capacity to perform a limited range of sedentary work. This finding is defective in light of the errors committed at steps 2 and 3 of the sequential evaluation process.

Our review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. We will, therefore, pursuant to 42 U.S.C. § 405(g) vacate the decision of the Commissioner and remand the case to the Commissioner for further proceedings.

An appropriate order will be entered.

s/A. Richard Caputo
A. RICHARD CAPUTO
United States District Judge

Dated: April 1 , 2013